EXHIBIT 4

STATE OF CALIFORNIA
CDC 7362 (Rev. 03/04)

# HEALTH CARE SERVICES REQUEST FORM

DEPARTMENT OF CORRECTIONS

## PART I: TO BE COMPLETED BY THE PATIENT

*A fee of $5.00 may be charged to your trust account for each health care visit.*

If you believe this is an urgent/emergent health care need, contact the correctional officer on duty.

| REQUEST FOR: | MEDICAL ☐ | MENTAL HEALTH ☐ | DENTAL ☐ | MEDICATION REFILL ☒ |
|---|---|---|---|---|

| NAME | CDC NUMBER | HOUSING |
|---|---|---|
| Hill, R.B | H43428 | LB-320 UP |

| PATIENT SIGNATURE | DATE |
|---|---|
| Raynard B Hill | 2-22-05 |

REASON YOU ARE REQUESTING HEALTH CARE SERVICES. (Describe Your Health Problem And How Long You Have Had The Problem)

I Need Refill of Asthma & Allergy Medication
& Renewal of Shrinna Cromo exp 12-04
Medications: Albuterol & Aerobid Inhalers    Thank You
Chlorpheniramine & Artificial Tears
Shoulder Problems Since 11-17-01

*NOTE: IF THE PATIENT IS UNABLE TO COMPLETE THE FORM, A HEALTH CARE STAFF MEMBER SHALL COMPLETE THE FORM ON BEHALF OF THE PATIENT AND DATE AND SIGN THE FORM*

## PART III: TO BE COMPLETED AFTER PATIENT'S APPOINTMENT

☐ Visit is not exempt from $5.00 copayment. (Send pink copy to Inmate Trust Office.)

## PART II: TO BE COMPLETED BY THE TRIAGE REGISTERED NURSE

| Date / Time Received: | | Received by: |
|---|---|---|
| Date / Time Reviewed by RN: | | Reviewed by: |

| S: | Pain Scale: | 1  2  3  4  5  6  7  8  9  10 |
|---|---|---|

O:  T: 98.6  P: 70  R: 18  BP: 154/78  WEIGHT: 232 lbs
[signature] 3/7/05 1050

A:

P:

☐ See Nursing Encounter Form

E:

| APPOINTMENT SCHEDULED AS: | EMERGENCY ☐ (IMMEDIATELY) | URGENT ☐ (WITHIN 24 HOURS) | ROUTINE ☐ (WITHIN 14 CALENDAR DAYS) |
|---|---|---|---|

| REFERRED TO PCP: | DATE OF APPOINTMENT: |
|---|---|
| COMPLETED BY | NAME OF INSTITUTION |

| PRINT / STAMP NAME | SIGNATURE / TITLE | DATE/TIME COMPLETED |
|---|---|---|

CDC 7362 (Rev. 03/04)    Original - Unit Health Record    Yellow - Inmate (if copayment applicable)    Pink - Inmate Trust Office (if copayment applicable)    Gold - Inmate

*11/9/05*

№ 187944

STATE OF CALIFORNIA
CDC 7362 (Rev. 03/04)

# HEALTH CARE SERVICES REQUEST FORM

DEPARTMENT OF CORRECTIONS

| PART I:  TO BE COMPLETED BY THE PATIENT |
|---|
| *A fee of $5.00 may be charged to your trust account for each health care visit.* |
| **If you believe this is an urgent/emergent health care need, contact the correctional officer on duty.** |

| REQUEST FOR: | MEDICAL ☒ | MENTAL HEALTH ☐ | DENTAL ☐ | MEDICATION REFILL ☒ |
|---|---|---|---|---|

| NAME *Hill, R.B.* | CDC NUMBER *H43428* | HOUSING *2A-255L* |
|---|---|---|

PATIENT SIGNATURE *Raymond B Hill*          DATE *3-23-05*

REASON YOU ARE REQUESTING HEALTH CARE SERVICES. (Describe Your Health Problem And How Long You Have Had The Problem) *Would like of Follow-up on X-Rays Taken on 3-10-05 of RT Shoulder which was Re-injured on 11-17-01. Had a previous Rotator Cuff Surgery, and after several attempts to get treatment, injury has been disregarded, and now in cronic pain & on medkation.*

*NOTE:  IF THE PATIENT IS UNABLE TO COMPLETE THE FORM, A HEALTH CARE STAFF MEMBER SHALL COMPLETE THE FORM ON BEHALF OF THE PATIENT AND DATE AND SIGN THE FORM*

| PART III:  TO BE COMPLETED AFTER PATIENT'S APPOINTMENT |
|---|
| ☐ Visit is not exempt from $5.00 copayment.  (Send pink copy to Inmate Trust Office.) |

| PART II:  TO BE COMPLETED BY THE TRIAGE REGISTERED NURSE |
|---|

| Date / Time Received: | Received by: |
|---|---|
| Date / Time Reviewed by RN: | Reviewed by: |

S:                                          Pain Scale:   1   2   3   4   5   6   7   8   9   10

O:   T: *97⁵*   P: *80*   R: *16*   BP: *130|86*   WEIGHT: *231*   *JSoffutt* 4-4-05

A:

P:
☐ **See Nursing Encounter Form**

E:

| APPOINTMENT SCHEDULED AS: | EMERGENCY ☐ (IMMEDIATELY) | URGENT ☐ (WITHIN 24 HOURS) | ROUTINE ☐ (WITHIN 14 CALENDAR DAYS) |
|---|---|---|---|
| REFERRED TO PCP: | | DATE OF APPOINTMENT: | |
| COMPLETED BY | | NAME OF INSTITUTION | |
| PRINT / STAMP NAME | SIGNATURE / TITLE | | DATE/TIME  COMPLETED |

CDC 7362 (Rev. 03/04)    Original - Unit Health Record    Yellow - Inmate (if copayment applicable)    Pink - Inmate Trust Office (if copayment applicable)    Gold - Inmate

# HEALTH CARE SERVICES REQUEST FORM

CDC 7362 (Rev. 03/04)

DEPARTMENT OF CORRECTIONS

## PART I: TO BE COMPLETED BY THE PATIENT

*A fee of $5.00 may be charged to your trust account for each health care visit.*

**If you believe this is an urgent/emergent health care need, contact the correctional officer on duty.**

REQUEST FOR:   MEDICAL ☒   MENTAL HEALTH ☐   DENTAL ☐   MEDICATION REFILL ☒

| NAME | CDC NUMBER | HOUSING |
|---|---|---|
| HILL, R.B. | H43428 | LA-255 L |

PATIENT SIGNATURE  *Richard B Hill*

DATE  8-11-05

REASON YOU ARE REQUESTING HEALTH CARE SERVICES. (Describe Your Health Problem And How Long You Have Had The Problem)  I NEED ASTHMA & ALLERGY MEDS RENEWED (2 INHALERS, ALLERGY PILLS & ARTIFICIAL TEARS,)

800 mg IBRUPROPHENS for PAIN in RT SHAULDER

*NOTE:* IF THE PATIENT IS UNABLE TO COMPLETE THE FORM, A HEALTH CARE STAFF MEMBER SHALL COMPLETE THE FORM ON BEHALF OF THE PATIENT AND DATE AND SIGN THE FORM

## PART III: TO BE COMPLETED AFTER PATIENT'S APPOINTMENT

☐ Visit is not exempt from $5.00 copayment. (Send pink copy to Inmate Trust Office.)

## PART II: TO BE COMPLETED BY THE TRIAGE REGISTERED NURSE

| Date / Time Received: | Received by: |
|---|---|
| Date / Time Reviewed by RN: | Reviewed by: |

**S:**  Pain Scale:  1  2  3  4  5  6  7  8  9  10

**O:** T: 99⁴  P: 78  R: 16  BP: 127/73  WEIGHT: 235 ½

8-26-05

10 55

**A:**

**P:**

☐ See Nursing Encounter Form

**E:**

| APPOINTMENT SCHEDULED AS: | EMERGENCY (IMMEDIATELY) ☐ | URGENT (WITHIN 24 HOURS) ☐ | ROUTINE (WITHIN 14 CALENDAR DAYS) ☐ |
|---|---|---|---|
| REFERRED TO PCP: | | DATE OF APPOINTMENT: | |
| COMPLETED BY | | NAME OF INSTITUTION | |

| PRINT / STAMP NAME | SIGNATURE / TITLE | DATE/TIME COMPLETED |
|---|---|---|
| | | |

CDC 7362 (Rev. 03/04)   Original - Unit Health Record   Yellow - Inmate (if copayment applicable)   Pink - Inmate Trust Office (if copayment applicable)   Gold - Inmate

B

STATE OF CALIFORNIA    DEPARTMENT OF CORRECTIONS
CDC 7362 (Rev. 03/04)

# HEALTH CARE SERVICES REQUEST FORM

## PART I: TO BE COMPLETED BY THE PATIENT

*A fee of $5.00 may be charged to your trust account for each health care visit.*

**If you believe this is an urgent/emergent health care need, contact the correctional officer on duty.**

| REQUEST FOR: | MEDICAL ☒ | MENTAL HEALTH ☐ | DENTAL ☐ | MEDICATION REFILL ☐ |
|---|---|---|---|---|

| NAME | CDC NUMBER | HOUSING |
|---|---|---|
| Hill, R. B. | H43428 | LA-255 Low |

| PATIENT SIGNATURE | DATE |
|---|---|
| Raymond B. Hill | 11-13-05 |

REASON YOU ARE REQUESTING HEALTH CARE SERVICES. (Describe Your Health Problem And How Long You Have Had The Problem) *R I Shoulder in extreme Pain, which you are authered, and any pain medication given, is not suffient (was scheduled for MRI on June 21, 2005, and to this date no MRI or attempt to elivinate Pain!!*

*NOTE: IF THE PATIENT IS UNABLE TO COMPLETE THE FORM, A HEALTH CARE STAFF MEMBER SHALL COMPLETE THE FORM ON BEHALF OF THE PATIENT AND DATE AND SIGN THE FORM*

## PART III: TO BE COMPLETED AFTER PATIENT'S APPOINTMENT

☐ Visit is not exempt from $5.00 copayment.  (Send pink copy to Inmate Trust Office.)

## PART II: TO BE COMPLETED BY THE TRIAGE REGISTERED NURSE

| Date / Time Received: | Received by: |
|---|---|
| Date / Time Reviewed by RN: | Reviewed by: |

| S: | Pain Scale:  1   2   3   4   5   6   7   8   9   10 |
|---|---|

O:    T:        P:        R:        BP:            WEIGHT:

A:

P:

☐ See Nursing Encounter Form

E:

| APPOINTMENT SCHEDULED AS: | EMERGENCY ☐ (IMMEDIATELY) | URGENT ☐ (WITHIN 24 HOURS) | ROUTINE ☐ (WITHIN 14 CALENDAR DAYS) |
|---|---|---|---|

| REFERRED TO PCP: | DATE OF APPOINTMENT: |
|---|---|
| COMPLETED BY | NAME OF INSTITUTION |

| PRINT / STAMP NAME | SIGNATURE / TITLE | DATE/TIME COMPLETED |
|---|---|---|

CDC 7362 (Rev. 03/04)  Original - Unit Health Record    Yellow - Inmate (if copayment applicable)    Pink - Inmate Trust Office (if copayment applicable)    Gold - Inmate

B

EXHIBIT 5

## PHYSICIAN REQUEST FOR SERVICES
### (To be completed by requesting Physician and forwarded to Utilization Management Unit)

| PATIENT NAME _Hill_ | CDC NUMBER _H43428_ | INSTITUTION |
|---|---|---|

| DATE OF BIRTH _3-10-60_ | EPRD DATE _2009_ | GENDER |
|---|---|---|

PRINCIPLE DIAGNOSIS _® Shoulder Pain, S/P Rotator Cuff Repair_   ICD - 9 CODE   CPT CODE(S)

REQUESTED SERVICE(S) _Orthopedics / Dr. Pompan_   # OF DAYS RECOMMENDED

Please circle all that apply:   Diagnostic Procedure/Consultation      Outpatient/Inpatient      Initial/Follow-up

Requested Treatment/Service is:   **EMERGENT**      **URGENT**      (**ROUTINE**)

For the purpose of retrospective review, if emergent or urgent, please justify: _____

Proposed Provider: _____   Anticipated Length of Stay: _____

Expected disposition (i.e.; outpatient follow-up, return to institution, transfer): _____

Medical Necessity (briefly describe the clinical situation; the history of the illness, treatments used, pertinent lab and imaging studies, or questions for the consultant): _DOI - Mar 2000    MRI - Full thickness Rotator Cuff Tear._
_DOS - Sept 21, 2000_
_Another injury - Nov 2001, XR - No changes._

Estimated time for service delivery, recovery, rehabilitation and follow-up: _____

Summary of preliminary or diagnostic work up, conservative treatment provided (if applicable, please provide TB code, CD4, viral load, albumin, total protein and dates within last 3 months): _____

Comments (diagrams, risk factors, prognosis, alternative management, etc.): _____

| REQUESTING PHYSICIAN PRINTED NAME _C.L. Sinnaco M.D._ | APPROVED / AUTHORIZED / DENIED / DEFERRED BY | DATE _4/17/05_ |
|---|---|---|
| REQUESTING PHYSICIAN SIGNATURE | DATE _4-4-05_ | Utilization management tracking #: _D4 D514 DP1970_ |

| DATE OF CONSULTATION _6/11/0_ | PRINTED NAME OF CONSULTANT _Pompan_ |
|---|---|

FINDINGS: _f/o    ® passive range_
_c/s   repair - re-injury_

RECOMMENDATIONS: _MRI   ® shoulder_
_MRI  c arthro MRI_

FOLLOW-UP OR FURTHER EVALUATIONS REQUESTED: _____

| CONSULTANT SIGNATURE _6/11_ | DATE | CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH |
|---|---|---|
| ETA RN SIGNATURE | DATE | _Hill,_ |
| PCP SIGNATURE | DATE | _H# 43428_ |

**Attach Progress Note page for additional information.**
**THIS FORM MUST BE RETURNED WITH THE PATIENT!!!**

DISTRIBUTION:
ORIGINAL - FILE IN UHR
GREEN   - TO UHR PENDING ORIGINAL
CANARY - CONSULTANT
PINK    - UM
GOLD    - SPECIALTY SCHEDULER

PHYSICIAN REQUEST FOR SERVICES (RFS)      CDC 7243 (Rev. 11/02)

STATE OF CALIFORNIA
HEALTH CARE SERVICES

## PHYSICIAN REQUEST FOR SERVICES
(To be completed by requesting Physician and forwarded to Utilization Management Unit) No LA 255L

| PATIENT NAME HILL, RAYNARD | CDC NUMBER H 43428 | INSTITUTION CTF (N) |
|---|---|---|

| DATE OF BIRTH 6L 3-10-60 | EPRD DATE 2009 | GENDER |
|---|---|---|

| PRINCIPLE DIAGNOSIS S/P Rotator Cuff Repair, (R) | ICD-9 CODE | CPT CODE(S) |
|---|---|---|

REQUESTED SERVICE(S)  MRI at Corcoran as Recomm. by Ortho. | # OF DAYS RECOMMENDED

*Please circle all that apply:* Diagnostic Procedure/Consultation     Outpatient/Inpatient     Initial/Follow-up

Requested Treatment/Service is:     **EMERGENT**          **URGENT**          **ROUTINE**

*For the purpose of retrospective review,* if emergent or urgent, please justify: _____

Proposed Provider: __Corcoran_____     Anticipated Length of Stay: _____

Expected disposition (i.e.: outpatient follow-up, return to institution, transfer): _____

Medical Necessity *(briefly describe the clinical situation; the history of the illness, treatments used, pertinent lab and imaging studies, or questions for the consultant):* DOI - Mar 2000
DOS/Repair - Sept 2000
Another injury - Nov 2001, XR - no change

Estimated time for service delivery, recovery, rehabilitation and follow-up: _____

Summary of preliminary or diagnostic work up, conservative treatment provided (if applicable, please provide TB code, CD4, viral load, albumin, total protein and dates within last 3 months): NSAIDs

Comments (diagrams, risk factors, prognosis, alternative management, etc.): _____

| REQUESTING PHYSICIAN PRINTED NAME C SINNA M.D. | APPROVED / AUTHORIZED / DENIED / DEFERRED BY DR N Doyl | DATE 6 27 05 |
|---|---|---|
| REQUESTING PHYSICIAN SIGNATURE | DATE 6-21-05 | Utilization management tracking # D4705 14 OP 2747 |

DATE OF CONSULTATION | PRINTED NAME OF CONSULTANT

FINDINGS: __MRI done 10/21/05__

RECOMMENDATIONS: _____

FOLLOW-UP OR FURTHER EVALUATIONS REQUESTED: _____

| CONSULTANT SIGNATURE | DATE 10/21/05 | CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH |
|---|---|---|
| ETA RN SIGNATURE Mull 7-78 | DATE 11/21/08 | |
| PCP SIGNATURE | DATE | |

**Attach Progress Note page for additional information.**
**THIS FORM MUST BE RETURNED WITH THE PATIENT!!!**

DISTRIBUTION:
ORIGINAL - FILE IN UHR
GREEN   - TO UHR PENDING ORIGINAL
CANARY  - CONSULTANT
PINK    - UM
GOLD    - SPECIALTY SCHEDULER

6/21/05: Orig to Sandy
R cvd 8/23/05 - MRI SCREEN COMPLETED
No MRI Transfer yet

PHYSICIAN REQUEST FOR SERVICES (RFS)          CDC 7243 (Rev. 11/02)

11/21/05 copy
to Sandy

# PHYSICIAN REQUEST FOR SERVICES
(To be completed by requesting Physician and forwarded to Utilization Management Unit)

| PATIENT NAME HILL | CDC NUMBER H43428 | INSTITUTION |
|---|---|---|

| DATE OF BIRTH 3-10-60 | EPRD DATE 2009 | GENDER |
|---|---|---|

PRINCIPLE DIAGNOSIS  S/P (R) Rotator Cuff Repair (2000)    ICD-9 CODE    CPT CODE(S)

REQUESTED SERVICE(S)  Orthopedics    # OF DAYS RECOMMENDED

*Please circle all that apply:* Diagnostic Procedure/Consultation    Outpatient/Inpatient    Initial/Follow-up

Requested Treatment/Service is:    EMERGENT    URGENT    (ROUTINE)

*For the purpose of retrospective review,* if emergent or urgent, please justify: _____

Proposed Provider: CTF Ortho.    Anticipated Length of Stay: _____

Expected disposition (i.e.: outpatient follow-up, return to institution, transfer): _____

Medical Necessity *(briefly describe the clinical situation; the history of the illness, treatments used, pertinent lab and imaging studies, or questions for the consultant):*  DOI - Mar 2000
POS - Sept 2000
Another Injury → Nov 2001

Estimated time for service delivery, recovery, rehabilitation and follow-up: _____

Summary of preliminary or diagnostic work up, conservative treatment provided (if applicable, please provide TB code, CD4, viral load, albumin, total protein and dates within last 3 months): _____

Comments (diagrams, risk factors, prognosis, alternative management, etc.): _____

| REQUESTING PHYSICIAN PRINTED NAME  C. SINNA-W | APPROVED / AUTHORIZED / DENIED / DEFERRED BY | DATE |
|---|---|---|

REQUESTING PHYSICIAN SIGNATURE  3/7/06    DATE 1-9-06    Utilization management tracking #:

DATE OF CONSULTATION  3/7/06    PRINTED NAME OF CONSULTANT  Morgan

FINDINGS: ___ impingement  (+) speeds
test ___ for finger
MRI surgical ___ for re-tear
Arthroscopy

RECOMMENDATIONS: (R) mobile arthroscopy
possible SLAP / rotator cuff
clean

FOLLOW-UP OR FURTHER EVALUATIONS REQUESTED: (in 3 approx —
(R) shoulder arthroscopy)

CONSULTANT SIGNATURE    DATE 3/7/06    CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH
Hill
H43428

KTR RN SIGNATURE  S. Morris Rn    DATE 3/7/06

PCP SIGNATURE    DATE

**Attach Progress Note page for additional information.**
**THIS FORM MUST BE RETURNED WITH THE PATIENT!!!**

DISTRIBUTION:
ORIGINAL - FILE IN UHR
GREEN    - TO UHR PENDING ORIGINAL
CANARY   - CONSULTANT
PINK     - UM
GOLD     - SPECIALTY SCHEDULER

PHYSICIAN REQUEST FOR SERVICES (RFS)    CDC 7243 (Rev. 11/02)

# HEALTH CARE SERVICES
## PHYSICIAN REQUEST FOR SERVICES
(To be completed by requesting Physician and forwarded to Utilization Management Unit)   NO LA 255 L

| PATIENT NAME Hill, Raymond | CDC NUMBER H43428 | | INSTITUTION CTF |
|---|---|---|---|
| DATE OF BIRTH 3-10-60 | EPRD DATE 2009 | GENDER Male | |
| PRINCIPLE DIAGNOSIS Rotator Cuff Tear | ICD-9 CODE | | CPT CODE(S) |
| REQUESTED SERVICE(S) (R) Shoulder Arthroscopy / Repair of Rotator Cuff | | | # OF DAYS RECOMMENDED |

Please circle all that apply:  Diagnostic Procedure/Consultation    Outpatient/Inpatient    Initial/Follow-up

Requested Treatment/Service is:    EMERGENT        URGENT        (ROUTINE)

For the purpose of retrospective review, if emergent or urgent, please justify: _____

Proposed Provider: Dr Pompan _____ Anticipated Length of Stay: _____

Expected disposition (i.e.: outpatient follow-up, return to institution, transfer): _____

Medical Necessity (briefly describe the clinical situation; the history of the illness, treatments used, pertinent lab and imaging studies, or questions for the consultant):
Requested by provider

Estimated time for service delivery, recovery, rehabilitation and follow-up: _____

Summary of preliminary or diagnostic work up, conservative treatment provided (if applicable, please provide TB code, CD4, viral load, albumin, total protein and dates within last 3 months): _____

Comments (diagrams, risk factors, prognosis, alternative management, etc.): _____

| REQUESTING PHYSICIAN PRINTED NAME C. Sinnico M.D | APPROVED / AUTHORIZED / DENIED / DEFERRED BY Dr Joe N Noyal | | DATE 7.13.01 |
|---|---|---|---|
| REQUESTING PHYSICIAN SIGNATURE | DATE | Utilization management tracking #: | |
| DATE OF CONSULTATION | PRINTED NAME OF CONSULTANT | | |

FINDINGS: _____

_____

_____

RECOMMENDATIONS: _____

_____

FOLLOW-UP OR FURTHER EVALUATIONS REQUESTED: _____

| CONSULTANT SIGNATURE | DATE | CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH |
|---|---|---|
| ETA RN SIGNATURE | DATE | |
| PCP SIGNATURE | DATE | |

**Attach Progress Note page for additional information.**
**THIS FORM MUST BE RETURNED WITH THE PATIENT!!!**

DISTRIBUTION:
ORIGINAL - FILE IN UHR
GREEN  - TO UHR PENDING ORIGINAL
CANARY  - CONSULTANT
PINK  - UM
GOLD  - SPECIALTY SCHEDULER

PHYSICIAN REQUEST FOR SERVICES (RFS)        CDC 7243 (Rev. 11/02)

EXHIBIT 6

## X-RAY REQUEST REPORT FORM

Institution: CC1

**PLEASE PRINT OR TYPE**

NAME: Raymond Hill
AGE: 42 DOB: 3/10/60 HOUSING: VB5A /03

X-RAY EXAM REQUESTED: (R) Shoulder
(ANATOMICAL TERMS ONLY)
CLINICAL HISTORY: Bilat feet
Surgy (R) Shoulder

NUMBER: H43428 UNIT: IVB
PREVIOUS X-RAYS ☒ YES ☐ NO
ORDERING M.D. HIRSCH
RN/MTA: M Phillips RNR
DATE ORDERED: 6/10/02
DATE COMPLETED: 6-18-02
NO. OF VIEWS: 2+ 3+ 3

### REPORT

THE CURRENT EXAMINATIONS CONSIST OF BOTH FEET AND RIGHT SHOULDER AND
ARE INCORRECTLY DATED, AS HAVING BEEN PERFORMED ON 6/18/02.  THE
EXAMINATIONS WERE ACTUALLY OBTAINED ON 6/17/02.

RIGHT SHOULDER, 2 VIEWS:  6/17/02

Two orthopedically introduced small, metal anchors are seen over the
humeral head, probably associated with previous tendon repair.  No
fracture or subluxation is seen.  No soft tissue calcifications noted.

IMPRESSION:  NO ACUTE, TRAUMATIC OR DESTRUCTIVE CHANGES.

STATUS POST-ORTHOPEDIC INTERVENTION.

BOTH FEET, 3 VIEWS EACH:  6/17/02

Mild, valgus deformities, of both great toes noted, slightly more
marked on the right than the left.  Very early tendon calcifications
are seen bilaterally, involving the Achilles' insertion site along
the posterior aspects of the calcanei.

IMPRESSION:  MILD, HALLUX VALGUS DEFORMITIES, BOTH GREAT TOES.

EARLY CALCIFIC TENDONITIS, ACHILLES' TENDON, BILATERALLY.

BERNARD KORDAN, M.D.
t:  6/19/02 jk

DATE DICTATED:
DATE TRANSCRIBED:
TRANSCRIBER:

X-RAY EXAM:

RADIOLOGIST _____ M.D.

X-RAY TECH INITIAL:

White=Medical File          Yellow=X-Ray File          Manila Card=Department File

X-RAY REPORT



**DEPARTMENT OF CORRECTIONS**
**CORRECTIONAL TRAINING FACILITY**

| NAME: | CDC #: | CELL: | DOB: | DATE: |
|-------|--------|-------|------|-------|
| HILL, R. | H-43428 | LB 320 | 3/10/60 | 3/10/05 |

**EXAM REQUESTED:**
RIGHT SHOULDER

**CLINICAL DATA:**

**REFERRING PHYSICIAN:**
C. SINNACO, M.D.

**RADIOGRAPHIC REPORT:**

**RIGHT SHOULDER:** Multiple views of the right shoulder are obtained on 3/10/05.

There is no evidence of any acute fracture or dislocation. The patient is status post surgery with two radiopaque densities overlying the humeral head similar with the previous examination.  There is no evidence of calcific tendonitis.

**IMPRESSION:**

**NO ACUTE ABNORMALITY IS IDENTIFIED.  POST SURGICAL CHANGES ARE PRESENT AS NOTED.**

| 3/10/05 | G. FALKOFF, M.D. | GF/cjw |
|---------|------------------|--------|
| DATE READ | RADIOLOGIST | 3/14/05 |

EXHIBIT $\underline{7}$

A MEDICAL GROUP
659 Abbott Street, Salinas, California 93901
Telephone (831) 775-5200

JAMES A. KOWALSKI, M.D.
DONALD A. CATALANO, M.D.
GILES A. DUESDIEKER, M.D.
MICHAEL E. BASSE, M.D.
DAVID A. STAUNTON, M.D.

GARY E. FALKOFF, M.D.
RICHARD A. VILLALOBOS, M.D.
CHRIS GLENN, M.D.
B. MISA HOSOHAMA, M.D.
Y-LAN HO, M.D.

| PATIENT NAME | ACCOUNT NO | RADIOLOGY NUMBER |
|---|---|---|
| RAYNARD H43428 HILL | 9349986 | 9349986 |

| AT THE REQUEST OF | DATE OF BIRTH | AGE/SEX | DATE OF SERVICE |
|---|---|---|---|
| CESAR SINNACO MD | 03/10/1960 | 45/ | 11/21/2005 |
| PO BOX 686 | | | |
| SOLEDAD, CA 93960 | | | |

The study was performed by an outside facility and the film submitted to Salinas Valley Radiologists for Interpretation.

MRI RIGHT SHOULDER

HISTORY: Status post rotator cuff repair. I have no further specific history.

PROCEDURE: 1.5T imaging was performed in three standard planes with T1 and T2 techniques as well as gradient echo imaging.

FINDINGS: There is a good deal of small fragment metallic artifact presenting with low and high signal in and around the rotator cuff. I cannot define the cuff anatomy except for the infraspinatus tendon which shows increased signal consistent with tendinitis. The subscapularis is also intact and the bicipital also, as far as I can tell. There is some ill-defined marrow signal. The labrum is grossly normal. I cannot see any cysts or masses.

IMPRESSION: Gross distortion of the anatomy in and around the supraspinatus muscle and tendon as well as the acromioclavicular joint in view of the prior surgery. It is really not possible to discern the presence of a recurrent tear or other specific pathology in these areas. The other regions appear to be free of gross disease.

Thank you for referring your patient to us,

Arthur M. Nathanson, MD
AMN/pa
11/29/05

# KERN RADIOLOGY MEDICAL GROUP, INC.
2301 Bahamas Drive
Bakersfield, CA 93309
(661) 326-9600

**CCI TEHACHAPI STATE PRISON**
**FAX# 823-5018 OR 823-3328**

PATIENT: HILL        DOB:        CDC# H43428
HOUSING: 2

INTERPRETATION OF OUTSIDE FILMS: MRI OF THE RIGHT SHOULDER: 09/12/07

A variety of imaging planes and parameters were utilized for visualization of suspected pathology.

FINDINGS: This study is extremely suboptimal due to the presence of paramagnetic signal artifact, possibly due to prior surgery or a gunshot wound without clear visualization of the acromion or acromioclavicular joint. This could be due to the distortions caused by the paramagnetic signal artifact or posttraumatic or postsurgical removal. The supraspinatus tendon is not visible at all, most probably completely torn and only the insertion of the infraspinatus tendon on the greater tubercle is visible suggesting a complete tear here as well. There is also marked narrowing of what remains of the coracoacromial arch tending to confirm these findings. The subscapularis and teres minor tendons are intact otherwise. The bicipital labral complex is poorly visualized for reasons described above, although the proximal biceps tendon is identified in the bicipital groove. There is no evidence for a labral tear. The glenohumeral ligaments are otherwise unremarkable.

**CONCLUSION:**
1. Severely degraded study as a result of multiple paramagnetic signal artifacts from metal, either postsurgical or posttraumatic with nonvisualized distal acromion and acromioclavicular joint either due to distortion from posttraumatic or postsurgical absence.
2. Probable complete tears of the supraspinatus and infraspinatus tendons with retraction and cephalic migration of the humeral head.
3. Nonvisualized bicipital labral complex, most probably due to the paramagnetic signal artifact described above.

Jeffrey K. Child, M.D.        D: 09/24/2007 T: 09/25/2007/lmj

Referring Physician: P. RUNYAN, PA-C

EXHIBIT _8_

## HEALTH SYSTEM
### TELEMEDICINE

November 03, 2006

RE:  HILL, RAYMOND
MR#: 1844475
DOB: 03/10/1960
Date of Service: 11/03/2006
CDC#:H43428

Harold Tate, MD
California Correctional Institution
P.O. Box 1031
Tehachapi, CA 93581

Dear Dr. Tate:

Thank you very much for requesting a consultation on behalf of Raymond
Hill, whom I had the pleasure of seeing in Orthopedic Telemedicine
Clinic.

**History Of Present Illness:**
As you know, Mr. Hill is a gentleman who underwent a right shoulder
large rotator cuff repair in 2000 with anchors. He was doing very well
for one year and anticipated a one year recovery time. His strength
returned when, unfortunately, about a year later he reinjured the
right shoulder. Unfortunately, since that time, the shoulder has again
become weak. He has pain with reaching, pain with impingement
maneuvers, pain at night. He denies any neurogenic symptoms. He had an
MRI which, unfortunately, distorted the normal architecture because of
the metal anchor screws. He was told by another orthopedic surgeon
that he needed to have a repeat rotator cuff repair and is waiting for
that now.

**Past Surgeries:**
1.    Status post right shoulder rotator cuff repair in 2000.
2.    Status post left fifth finger open reduction and internal
fixation.

**Medical Illnesses:**
1.    Right shoulder pain.
2.    Asthma.
3.    Allergic rhinitis.

**Medications:**
Albuterol inhaler, triamcinolone inhaler, chlorpheniramine,
methocarbamol, Motrin.

**Allergies:**
None known.

**Family History:**
Noncontributory.

**Social History:**
He is incarcerated.

Page 2

**Review Of Systems:**
I refer you to the paper medical record.

**Physical Examination:**
On physical examination, he is an alert, pleasant, cooperative
gentleman in no acute distress. Gait and posture are normal. Right
shoulder reveals forward flexion limited from 0 to 90, abduction from
0 to 90 with a painful arc, external rotation from 0 to 50, and with
internal rotation he can bring his thumb to T10. Strength testing of
supraspinatus reveals 4/5 strength. Infraspinatus and subscapularis
testing reveal 4+/5 strength.

**Assessment:**
Right shoulder probable rotator cuff re-tear.

**Plan:**
I am recommending to proceed with arthroscopy for a rotator cuff
repair on Mr. Hill's right shoulder. He is very willing to do this.

The patient was educated in the impression and the plan of care.

Thank you very much for your kind request for consultation.

Sincerely yours,


JEFFREY L TANJI, MD
ASSOCIATE MEDICAL DIRECTOR
DIVISION OF UCDHS PRIMARY CARE NETWORK
DEPARTMENT OF SPORTS MEDICINE
*THIS WAS ELECTRONICALLY SIGNED - 11/06/2006 8:04 AM PST BY:*




JLT:js(ml006)

D:    11/03/2006 09:00 AM
T:    11/03/2006 03:15 PM
C#:   2268756

EXHIBIT __9__

# MARSHALL S. LEWIS, M.D.

## TEHACHAPI CLINIC

October 29, 2007

RE:        HILL, RAYNARD
CHART#:    IMC0667
CDC#:      H43428/California Correctional Institute

### INITIAL COMPREHENSIVE ORTHOPEDIC
### TELEMED CONSULTATION

This is a 47-year-old black male who sustained injury in 2000 and a second injury in 2001. The patient claims that he initially sustained injury to his right shoulder from a fall on a wet surface. He claims that he was told that he had a torn rotator cuff and had rotator cuff repair in 2000. He was trying to improve his motion when he had another injury in 2001.

The patient continues to have pain in the right shoulder. He describes night pain and increased pain in the right shoulder with activity. This is the patient's dominant extremity. He also describes decreased range of motion in the shoulder.

### PAST MEDICAL HISTORY:

Allergies:               None.

Current Medications:     Tylenol #3 with Codeine, ibuprofen, Albuterol
                         inhaler and Methocarbamol.

Illnesses:               The patient has a history of asthma and is taking
                         Albuterol inhaler.

Surgeries:               Right shoulder rotator cuff repair in 2000. He also
                         had a prior ligament repair of the fifth digit of the
                         left hand.

13061 Rosedale Highway, Ste. G, PMB-102-Bakersfield, CA 93312 (661) 589-2190 Fax (661) 587-1427

RE: HILL, RAYNARD
Page 2
October 29, 2007

## PAST MEDICAL HISTORY: (continued)

Fractures:                          Fracture of the left humerus 30 years ago.

## FAMILY HISTORY:

There is a history of diabetes on the mother's side and lung cancer on the father's side.
His father is a heavy smoker.

## PHYSICAL EXAMINATION:

Examination of the right shoulder reveals a well-healed scar, which is about 3" long from
prior rotator cuff repair. There is only 90 degrees of abduction in the right shoulder
compared to 165 degrees on the left side. The patient has 90 degrees forward flexion in
the right shoulder compared to 165 degrees on the left side. There is 50% restriction of
external and internal rotation compared to the left shoulder. The patient has 20 degrees
less internal rotation in the right shoulder compared to the left side and compared to 50%
restriction of external rotation in the right shoulder compared to the left side. There is
markedly decreased strength of the abductors and external rotators of the right shoulder.
The patient has exquisite tenderness over the AC joint of the shoulder and exquisite
tenderness over the anterolateral and lateral aspect of the acromion. Flexion, adduction
and internal rotation cause accentuated pain.

## RADIOGRAPHIC DATA:

The patient had a recent MRI performed two weeks ago. Unfortunately, the copy of the
MRI report is not yet available. The patient had a prior MRI of the right shoulder
performed in Salinas on November 21, 2005, read by Dr. Nathanson, and the impression
was "Gross distortion of the anatomy in and around the supraspinatus muscle and tendon,
as well as the acromioclavicular joint in view of the prior surgery. It is really not possible
to discern the presence of recurrent tear or other specific pathology in these areas. The
other regions appear to be free of gross disease."

I am in receipt of UC Davis Telemed Consult dated November 3, 2006, from Dr. Tanji.
The assessment was "right shoulder probable rotator cuff re-tear." Under the plan, it
stated, "I recommended arthroscopy for rotator cuff repair on Mr. Hill's right shoulder.
He is very willing to do this."

## IMPRESSION:

1.      Right rotator cuff tendinitis.

RE: HILL, RAYNARD
Page 3
October 29, 2007

## IMPRESSION: (continued)

2.    Status post right rotator cuff repair in 2000.
3.    Recurrent tear, right rotator cuff.
4.    Impingement syndrome of the right shoulder clinically.
5.    Right subacromial bursitis of the shoulder.

## TREATMENT PLAN:

The MRI of the right shoulder has been performed and it is felt that we should wait for the report, which, hopefully, should be here sometime in the near future as it was performed two weeks ago. It is not understandable to this orthopedic surgeon why we should have to wait two weeks to obtain a report on an MRI. The patient is to be given a follow-up appointment for evaluation in three weeks, at which time the MRI can be reviewed and further discussion over treatment will take place. From a clinical point of view, it is felt this patient will require arthroscopy with arthroscopic surgery of the right shoulder. I will not do a primary re-repair of the rotator cuff. If there is evidence on MRI of impingement, which persists, I would de-impinge the shoulder, release adhesions, do a little further acromioplasty and some resection at the distal end of the right clavicle. If this not successful, at a later time on a different surgical procedure, I would consider an open rotator cuff repair of the right shoulder. However, this is fraught with the possibility of stiff shoulder and it is clearly noted that this patient has never recovered full range of motion from the first surgery. At this time, the patient 50% restriction of abduction, 50% restriction of external rotation in the right shoulder and 50% restriction of forward flexion in the right shoulder when compared to the left side. This has been discussed with the patient and he will be re-evaluated in three weeks.


Marshall S. Lewis, M.D.

/sl
11/9/07

EXHIBIT __10__

March 6, 2007

Raynard Hill
California Correctional Institution
P.O. Box 608
H43428, Unit 2, Dorm 2, Bed 81 Low
Tehachapi, CA  93581

Dear Mr. Hill:

Thank you for your recent request for information concerning the availability of a package insert for ibuprofen tablets, USP.

The above information is supplied to you as a professional service in response to your specific request.  Watson Pharmaceuticals, Inc. makes no recommendation regarding unapproved uses. The full prescribing information is enclosed for your review.

Please contact our Medical Communications Department at 800-272-5525 should you have any further questions.

Thank you for your interest in Watson Pharmaceuticals, Inc. products.

Sincerely,

*Olivia Kim* OK

Olivia Kim, Pharm.D.
Medical Communications Specialist
Watson Laboratories, Inc.
(800)272-5525

2161

**Enclosure:**   Ibuprofen PI Interpharm

360 Mt. Kemble Avenue, Morristown, NJ 07962-1953 • Tel: 973/355-8300 • Website: www.watsonpharm.com

The Ibuprofen tablets, USP package insert you requested is enclosed. It provides medical information that was included for the FDA review and approval of the product. We recommend that you contact your healthcare provider for any further questions, as they will best be able to address them in the context of your specific medical needs.

Ibuprofen, a Nonsteroidal Anti-Inflammatory Drug (NSAID) is available in 400 mg, 600 mg and 800 mg tablets for oral administration.

**Inactive Ingredients:** Colloidal Silicon Dioxide, Corn Starch, Hydroxypropyl Cellulose, Hypromellose, Lactose Anhydrous, Magnesium Stearate, Microcrystalline Cellulose, Polyethylene Glycol, Povidone, Sodium Lauryl Sulfate, Sodium Starch Glycolate, Titanium Dioxide.

**CLINICAL PHARMACOLOGY:**

Ibuprofen possesses analgesic and antipyretic activities. Its mode of action, like that of other nonsteroidal anti-inflammatory agents, is not completely understood, but may be related to prostaglandin synthetase inhibition.

In clinical studies in patients with rheumatoid arthritis and osteoarthritis, ibuprofen has been shown to be comparable to aspirin in controlling the pain and inflammation and to be associated with a statistically significant reduction in the milder gastrointestinal side effects (see ADVERSE REACTIONS). Ibuprofen may be well tolerated in some patients who have had gastrointestinal side effects with aspirin, but these patients when treated with ibuprofen should be carefully followed for signs and symptoms of gastrointestinal ulceration and bleeding. Although it is not definitely known whether ibuprofen causes less peptic ulceration than aspirin, in one study involving 885 patients with rheumatoid arthritis treated for up to one year, there were no reports of gastric ulceration with ibuprofen whereas frank ulceration was reported in 13 patients in the aspirin group (statistically significant p < .001).

Gastroscopic studies at varying doses show an increased tendency toward gastric irritation at higher doses. However, at comparable doses, gastric irritation is approximately half that seen with aspirin. Studies using $^{51}$Cr-tagged red cells indicate that fecal blood loss associated with ibuprofen in doses up to 2400 mg daily did not exceed the normal range, and was significantly less than that seen in aspirin-treated patients. In clinical studies in patients with rheumatoid arthritis, ibuprofen has been shown to be comparable to indomethacin in controlling the signs and symptoms of disease activity and to be associated with a statistically significant reduction of the milder gastrointestinal (see ADVERSE REACTIONS) and CNS side effects.

Ibuprofen may be used in combination with gold salts and/or corticosteroids.

Controlled studies have demonstrated that ibuprofen is a more effective analgesic than propoxyphene for the relief of episiotomy pain or pain following dental extraction procedures, and for the relief of the symptoms of primary dysmenorrhea.

In patients with primary dysmenorrhea, ibuprofen has been shown to reduce elevated levels of prostaglandin activity in the menstrual fluid and to reduce resting and active intrauterine pressure, as well as the frequency of uterine contractions. The probable mechanism of action is to inhibit prostaglandin synthesis rather than simply to provide analgesia.

Ibuprofen is rapidly absorbed. Peak serum ibuprofen levels are generally attained one to two hours after administration. With single doses up to 800 mg, a linear relationship exists between amount of drug administered and the integrated area under the serum drug concentration vs. time curve. Above 800 mg, however, the area under the curve increases less than proportional to increase in dose. There is no evidence of drug accumulation or enzyme induction.

The administration of ibuprofen tablets either under fasting conditions or immediately before meals yields quite similar serum ibuprofen concentration-time profiles. When ibuprofen is administered immediately after a meal, there is a reduction in the rate of absorption but no appreciable decrease in the extent of absorption. The bioavailability of the drug is minimally altered by the presence of food.

There is no interference with the absorption of ibuprofen when given in conjunction with an antacid containing both aluminum hydroxide and magnesium hydroxide.

Ibuprofen is rapidly metabolized and eliminated in the urine. The excretion of ibuprofen is virtually complete 24 hours after the last dose. The serum half-life is 1.8 to 2.0 hours.

Studies have shown that following ingestion of the drug, 45% to 79% of the dose was recovered in the urine within 24 hours as metabolite A (25%), ( + )-2-[p-(2-hydroxymethylpropyl)phenyl], propionic acid and metabolite B (37%), ( + )-2-[p-(2 carboxypropyl)phenyl] propionic acid; the percentages of free and conjugated ibuprofen were approximately 1% and 14%, respectively.

**INDICATIONS AND USAGE:**

Ibuprofen Tablets are indicated for relief of the signs and symptoms of rheumatoid arthritis and osteoarthritis.

Ibuprofen is indicated for relief of mild to moderate pain.

Ibuprofen is also indicated for the treatment of primary dysmenorrhea.

Since there have been no controlled clinical trials to demonstrate whether or not there is any beneficial effect or harmful interaction with the use of ibuprofen in conjunction with aspirin, the combination cannot be recommended (see Drug Interactions).

Controlled clinical trials to establish the safety and effectiveness of ibuprofen in children have not been conducted.

**CONTRAINDICATIONS:**

Ibuprofen Tablets should not be used in patients who have previously exhibited hypersensitivity to the drug, or in individuals with the syndrome of nasal polyps, angioedema and bronchospastic reactivity to aspirin or other nonsteroidal anti-inflammatory agents. Anaphylactoid reactions have occurred in such patients.

**WARNINGS:**

**Risk of GI Ulceration, Bleeding and Perforation with NSAID Therapy:** Serious gastrointestinal toxicity such as bleeding, ulceration, and perforation, can occur at any time, with or without warning symptoms, in patients treated chronically with NSAID therapy. Although minor upper gastrointestinal problems such as dyspepsia, are common, usually developing early in therapy, physicians should remain alert for ulceration and bleeding in patients treated chronically with NSAIDS even in the absence of previous GI tract symptoms. In patients observed in clinical trials of several months to two years duration, symptomatic upper GI ulcers, gross bleeding or perforation appear to occur in approximately 1% of patients treated for 3-6 months, and in about 2-4% of patients treated for one year. Physicians should inform patients about the signs and/or symptoms of serious GI toxicity and what steps to take if they occur.

Studies to date have not identified any subset of patients not at risk of developing peptic ulceration and bleeding. Except for a prior history of serious GI events and other risk factors known to be associated with peptic ulcer disease, such as alcoholism, smoking, etc., no risk factors (e.g. age, sex) have been associated with increased risk. Elderly or debilitated patients seem to tolerate ulceration or bleeding less well than other individuals and most spontaneous reports of fatal GI events are in this population. Studies to date are inconclusive concerning the relative risk of various NSAIDS in causing such reactions. High doses of any NSAID probably carry a greater risk of these reactions, although controlled clinical trials showing this do not exist in most cases. In considering the use of relatively large doses (within the recommended dosage range), sufficient benefit should be anticipated to offset the potential increased risk of GI toxicity.

**PRECAUTIONS:**

**General:** Blurred and/or diminished vision, scotomata, and/or changes in color vision have been reported. If a patient develops such complaints while receiving ibuprofen tablets, the drug should be discontinued, and the patient should have an ophthalmologic examination which includes central visual fields and color vision testing.

Fluid retention and edema have been reported in association with ibuprofen; therefore, the drug should be used with caution in patients with a history of cardiac decompensation or hypertension.

Ibuprofen like other nonsteroidal anti-inflammatory agents, can inhibit platelet aggregation but the effect is quantitatively less and of shorter duration than that seen with aspirin. Ibuprofen has been shown to prolong bleeding time (but within the normal range) in normal subjects. Because this prolonged bleeding effect may be exaggerated in patients with underlying hemostatic defects, ibuprofen should be used with caution in persons with intrinsic coagulation defects and those on anticoagulant therapy.

Patients on ibuprofen should report to their physicians signs or symptoms of gastrointestinal ulceration or bleeding, blurred vision or other eye symptoms, skin rash, weight gain, or edema.

In order to avoid exacerbation of disease or adrenal insufficiency, patients who have been on prolonged corticosteroid therapy should have their therapy tapered slowly rather than discontinued abruptly when ibuprofen is added to the treatment program.

The antipyretic and anti-inflammatory activity of ibuprofen may reduce fever and inflammation, thus diminishing their utility as diagnostic signs in detecting complications of presumed non-infectious noninflammatory painful conditions.

**Liver Effects:** As with other nonsteroidal anti-inflammatory drugs, borderline elevations of one or more liver tests may occur in up to 15% of patients. These abnormalities may progress, may remain essentially unchanged, or may be transient with continued therapy. The SGPT (ALT) test is probably the most sensitive indicator of liver dysfunction. Meaningful (3 times the upper limit of normal) elevations of the SGPT or SGOT (AST) occurred in controlled clinical trials in less than 1% of patients. A patient with symptoms and/or signs suggesting liver dysfunction, or in whom an abnormal liver test has occurred, should be evaluated for evidence of the development of more severe hepatic reaction while on therapy with ibuprofen. Severe hepatic reactions, including jaundice and cases of fatal hepatitis, have been reported with ibuprofen as with other nonsteroidal anti-inflammatory drugs. Although such reactions are rare, if abnormal liver tests persist or worsen, if clinical signs and symptoms consistent with liver disease develop, or if systemic manifestations occur (e.g. eosinophilia, rash, etc.), ibuprofen should be discontinued.

patients taking 2400 mg of ibuprofen daily (rheumatoid arthritis). Positive stool occult blood tests were observed; serum creatinine levels were also observed in these studies.

**Aseptic Meningitis:** Aseptic meningitis with fever and coma has been observed on rare occasions in patients on ibuprofen therapy. Although it is probably more likely to occur in patients with systemic lupus erythematosus and related connective tissue diseases, it has been reported in patients who do not have an underlying chronic disease. If signs or symptoms of meningitis develop in a patient on ibuprofen, the possibility of its being related to ibuprofen should be considered.

**Renal Effects:** As with other nonsteroidal anti-inflammatory drugs, long term administration of ibuprofen to animals has resulted in renal papillary necrosis and other abnormal renal pathology. In humans, there have been reports of acute interstitial nephritis with hematuria, proteinuria, and occasionally nephrotic syndrome.

A second form of renal toxicity has been seen in patients with prerenal conditions leading to a reduction in renal blood flow or blood volume, where the renal prostaglandins have a supportive role in the maintenance of renal perfusion. In these patients administration of nonsteroidal anti-inflammatory drugs may cause a dose-dependent reduction in prostaglandin formation and may precipitate overt renal decompensation. Patients at greatest risk of this reaction are those with impaired renal function, heart failure, liver dysfunction, those taking diuretics and the elderly. Discontinuation of nonsteroidal anti-inflammatory drug therapy is typically followed by recovery to the pretreatment state. Those patients at high risk who chronically take ibuprofen should have renal function monitored if they have signs or symptoms which may be consistent with mild azotemia, such as malaise, fatigue, loss of appetite, etc. Occasional patients may develop some elevation of serum creatinine and BUN levels without signs or symptoms.

Since ibuprofen is eliminated primarily by the kidneys, patients with significantly impaired renal function should be closely monitored; and a reduction in dosage should be anticipated to avoid drug accumulation. Prospective studies on the safety of ibuprofen in patients with chronic renal failure have not been conducted.

**Information for Patients:** Ibuprofen, like other drugs of its class, is not free of side effects. The side effects of these drugs can cause discomfort and, rarely, there are more serious side effects, such as gastrointestinal bleeding, which may result in hospitalization and even fatal outcomes. NSAIDs (Nonsteroidal Anti-Inflammatory Drugs) are often essential agents in the management of arthritis and have a major role in the treatment of pain, but they also may be commonly employed for conditions which are less serious.

Physicians may wish to discuss with their patients the potential risks (see WARNINGS, PRECAUTIONS, and ADVERSE REACTIONS sections) and likely benefits of NSAID treatment, particularly when the drugs are used for less serious conditions where treatment without NSAIDs may represent an acceptable alternative to both the patient and physician.

**Laboratory Tests:** Because serious GI tract ulceration and bleeding can occur without warning symptoms, physicians should follow chronically treated patients for the signs and symptoms of ulceration and bleeding and inform them of the importance of this follow-up (see WARNINGS, Risk of GI Ulcerations, Bleeding and Perforation with NSAID Therapy).

**Drug Interactions:** *Coumarin-type anticoagulants:* Several short-term controlled studies failed to show that ibuprofen significantly affected prothrombin times or a variety of other clotting factors when administered to individuals on coumarin-type anticoagulants. However, because bleeding has been reported when ibuprofen and other nonsteroidal anti-inflammatory agents have been administered to patients on coumarin-type anticoagulants, the physician should be cautious when administering ibuprofen to patients on anticoagulants.

*Aspirin:* Animal studies show that aspirin given with nonsteroidal anti-inflammatory agents, including ibuprofen, yields a net decrease in anti-inflammatory activity with lowered blood levels of the non-aspirin drug. Single dose bioavailability studies in normal volunteers have failed to show an effect of aspirin on ibuprofen blood levels. Correlative clinical studies have not been done.

*Methotrexate:* Ibuprofen, as well as other nonsteroidal anti-inflammatory drugs, probably reduces the tubular secretion of methotrexate based on in vitro studies in rabbit kidney slices. This may indicate that ibuprofen could enhance the toxicity of methotrexate. Caution should be used if ibuprofen is administered concomitantly with methotrexate.

*H-2 Antagonists:* In studies with human volunteers, co-administration of cimetidine or ranitidine with ibuprofen had no substantive effect on ibuprofen serum concentrations.

*Furosemide:* Clinical studies, as well as random observations, have shown that ibuprofen can reduce the natriuretic effect of furosemide and thiazides in some patients. This response has been attributed to inhibition of renal prostaglandin synthesis. During concomitant therapy with ibuprofen, the patient should be observed closely for signs of renal failure (see PRECAUTIONS Renal Effects), as well as to assure diuretic efficacy.

*Lithium:* Ibuprofen produced an elevation of plasma lithium levels and a reduction in renal lithium clearance in a study of eleven normal volunteers. The mean minimum lithium concentration increased 15% and the renal clearance of lithium was decreased by 19% during this period of concomitant drug administration.

This effect has been attributed to inhibition of renal prostaglandin synthesis by ibuprofen. Thus, when ibuprofen and lithium are administered concurrently, subjects should be observed carefully for signs of lithium toxicity. (Read circulars for lithium preparation before use of such concurrent therapy.)

**Pregnancy:** Reproductive studies conducted in rats and rabbits at doses somewhat less than the maximal clinical dose did not demonstrate evidence of developmental abnormalities. However, animal reproduction studies are not always predictive of human response. As there are no adequate and well-controlled studies in pregnant women, this drug should be used during pregnancy only if clearly needed. Because of the known effects of nonsteroidal anti-inflammatory drugs on the fetal cardiovascular system (closure of ductus arteriosus), use during late pregnancy should be avoided. As with other drugs known to inhibit prostaglandin synthesis, an increased incidence of dystocia and delayed parturition occurred in rats. Administration of ibuprofen is not recommended during pregnancy.

**Nursing Mothers:** In limited studies, an assay capable of detecting 1 mcg/mL did not demonstrate ibuprofen in the milk of lactating mothers. However, because of the limited nature of the studies, and the possible adverse effects of prostaglandin-inhibiting drugs on neonates, ibuprofen is not recommended for use in nursing mothers.

## ADVERSE REACTIONS:

The most frequent type of adverse reaction occurring with ibuprofen tablets is gastrointestinal. In controlled clinical trials the percentage of patients reporting one or more gastrointestinal complaints ranged from 4% to 16%.

In controlled studies when ibuprofen was compared to aspirin and indomethacin in equally effective doses the overall incidence of gastrointestinal complaints was about half that seen in either the aspirin or indomethacin-treated patients.

Adverse reactions observed during controlled clinical trials at an incidence greater than 1% are listed in the following tables. These reactions listed in column 1 encompass observations in approximately 3,000 patients. More than 500 of these patients were treated for periods of at least 54 weeks.

Still other reactions occur less frequently than 1 in 100 were reported in controlled clinical trials and from marketing experience. These reactions have been divided into two categories: Column 2 of the following table lists reactions with therapy with ibuprofen where the probability of a causal relationship exists; for the reactions in Column 3 a causal relationship with ibuprofen has not been established.

Reported side effects were higher at doses of 3200 mg/day than at doses of 2400 mg or less per day in clinical trials of patients with rheumatoid arthritis. The increase in incidence was slight and still within the ranges reported in the following table.

| Incidence Greater Than 1% (but less than 3%) Probable Causal Relationship | Precise Incidence Unknown (but less than 1%) Probable Causal Relationship** | Precise Incidence Unknown (but less than 1%) Causal Relationships Unknown** |
|---|---|---|
| **GASTROINTESTINAL** | | |
| Nausea*, epigastric pain*, heartburn*, diarrhea, abdominal distress, nausea and vomiting, indigestion, constipation, abdominal cramps or pain, fullness of GI tract (bloating and flatulence) | Gastric or duodenal ulcer with bleeding and/or perforation, gastrointestinal hemorrhage, melena, gastritis, hepatitis, jaundice, abnormal liver function tests; Pancreatitis | |
| **CENTRAL NERVOUS SYSTEM** | | |
| Dizziness*, headache, nervousness | Depression, insomnia, confusion, emotional lability, somnolence, aseptic meningitis with fever and coma (See PRECAUTIONS) | Paresthesias, hallucinations, dream abnormalities, pseudotumor cerebri |
| **DERMATOLOGIC** | | |
| Rash* (including maculopapular type), pruritus | Vesiculobullous eruptions, urticaria, erythema multiforme, Stevens-Johnson syndrome, alopecia | Toxic epidermal necrolysis, photoallergic skin reactions |
| **SPECIAL SENSES** | | |
| Tinnitus | Hearing loss, amblyopia (blurred and/or diminished vision, scotomata and/or changes in color vision) (see PRECAUTIONS) | Conjunctivitis, diplopia, optic neuritis, cataracts |

| | | Concomitants, hypoglycemic reaction, acidosis |
|---|---|---|
| Decreased appetite | | |
| **CARDIOVASCULAR** Edema, fluid retention (generally responds promptly to drug discontinuation (see PRECAUTIONS) | Congestive heart failure in patients with marginal cardiac function, elevated blood pressure, palpitations | Arrhythmias (sinus tachycardia, sinus bradycardia) |
| **ALLERGIC** | Syndrome of abdominal pain, fever, chills, nausea and vomiting; anaphylaxis; bronchospasm (see CONTRAINDICATIONS) | Serum sickness, lupus erythematosus syndrome, Henoch-Schonlein vasculitis, angioedema |
| **RENAL** | Acute renal failure (see PRECAUTIONS), decreased creatinine clearance, polyuria, azotemia, cystitis, hematuria | Renal papillary necrosis |
| **MISCELLANEOUS** | Dry eyes and mouth, gingival ulcer, rhinitis | |

*Reactions occurring in 3% to 9% of patients treated with ibuprofen. (Those reactions occurring in less than 3% of the patients are unmarked).

**Reactions are classified under *"Probable Causal Relationship (PCR)"* if there has been one positive rechallenge or if three or more cases occur which might be causally related. Reactions are classified under *"Causal Relationship Unknown"* if seven or more events have been reported but the criteria for PCR have not been met.

## OVERDOSAGE:
Approximately 1½ hours after the reported ingestion of from 7 to 10 ibuprofen Tablets (400 mg), a 19-month old child weighing 12 kg was seen in the hospital emergency room, apneic and cyanotic, responding only to painful stimuli. This type of stimulus, however, was sufficient to induce respiration. Oxygen and parenteral fluids were given; a greenish-yellow fluid was aspirated from the stomach with no evidence to indicate the presence of ibuprofen. Two hours after ingestion the child's condition seemed stable; she still responded only to painful stimuli and continued to have periods of apnea lasting from 5 to 10 seconds. She was admitted to intensive care and sodium bicarbonate was administered as well as infusions of dextrose and normal saline. By four hours post-ingestion she could be aroused easily, sit by herself and respond to spoken commands. Blood level of ibuprofen was 102.9 ug/mL approximately 8½ hours after accidental ingestion. At 12 hours she appeared to be completely recovered.

In two other reported cases where children (each weighing approximately 10 kg) accidentally, acutely ingested approximately 120 mg/kg, there were no signs of acute intoxication or late sequelae. Blood level in one child 90 minutes after ingestion was 700 ug/mL – about 10 times the peak levels seen in absorption-excretion studies.

A 19-year old male who had taken 8,000 mg of ibuprofen over a period of a few hours complained of dizziness, and nystagmus was noted. After hospitalization, parenteral hydration and three days bed rest, he recovered with no reported sequelae.

In cases of acute overdosage, the stomach should be emptied by vomiting or lavage, though little drug will likely be recovered if more than an hour has elapsed since ingestion. Because the drug is acidic and is excreted in the urine, it is theoretically beneficial to administer alkali and induce diuresis. In addition to supportive measures, the use of oral activated charcoal may help to reduce the absorption and reabsorption of ibuprofen.

## DOSAGE AND ADMINISTRATION:
Do not exceed 3,200 mg total daily dose. If gastrointestinal complaints occur, administer ibuprofen tablets with meals or milk.
Rheumatoid arthritis and osteoarthritis, including flareups of chronic disease: *Suggested Dosage:* 1200-3200 mg daily (300 mg q.i.d.; 400 mg, 600 mg or 800 mg t.i.d. or q.i.d.). Individual patients may show a better response to 3200 mg daily, as compared with 2400 mg, although in well-controlled clinical trials, patients on 3200 mg did not show a better mean response in terms of efficacy. Therefore, when treating patients with 3200 mg/day, the physician should observe sufficient increased clinical benefits to offset potential increased risk.
The dose of ibuprofen should be tailored to each patient, and may be lowered or raised from the suggested doses depending on the severity of symptoms either at time of initiating drug therapy or as the patient responds or fails to respond.
In general, patients with rheumatoid arthritis seem to require higher doses of ibuprofen than do patients with osteoarthritis.
The smallest dose of ibuprofen that yields acceptable control should be employed. A linear blood level dose-response relationship exists with single doses up to 800 mg. (See CLINICAL PHARMACOLOGY for effects of food on rate of absorption).
The commercial availability of multiple strengths facilitates dosage adjustment.
In chronic conditions, a therapeutic response to therapy with ibuprofen is sometimes seen in a few days to a week but most often is observed by two weeks. After a satisfactory response has been achieved, the patient's dose should be reviewed and adjusted as required.
Mild to moderate pain: 400 mg every 4 to 6 hours as necessary for relief of pain.
In controlled analgesic clinical trials, doses of ibuprofen greater than 400 mg were no more effective than the 400 mg dose.
Dysmenorrhea: For the treatment of dysmenorrhea, beginning with the earliest onset of such pain, ibuprofen should be given in a dose of 400 mg every 4 hours as necessary for the relief of pain.

## HOW SUPPLIED:
Ibuprofen Tablets are available as follows:
400 mg Tablets are round, convex, white, film coated tablets, debossed with IP 131 on one side, on other side debossed with 400; in bottles of 24, 30, 50, 60, 90, 100, 180, 270 and 500 tablets.
600 mg Tablets are oval shaped, white, film coated tablets, debossed with IP 132 on one side, on other side debossed with 600; in bottles of 24, 30, 50, 60, 80, 100, 180, 270 and 500 tablets.
800 mg Tablets are capsule shaped, white, film coated tablets, debossed with IP 137 on one side, on other side debossed with 800; in bottles of 24, 30, 50, 60, 90, 100 and 500 tablets.
Note: The 24 bottle size is in a unit-of-use container, provided with a child-resistant closure.
Store at controlled room temperature 15°-30°C (59°-86°F).
Rx only

Manufactured by:
Interpharm Inc.
Hauppauge, NY 11788

Revised 04/04

MG #19737

EXHIBIT **11**

# FOUNDATION
# LABORATORY
M.Y. Nasir, M.D., Director
Allen Jay M.D., Co-Director and Pathologist

CAL CORRECTION INSTITUTE
24900 HWY 202
TEHACHAPI, CA 93561

| PATIENT NAME | AGE | DOB | SEX | ID NO. | ACCESSION NO. |
|---|---|---|---|---|---|
| Hill, H43428 | 47 | 3/10/60 | M | H43428 | 1442039 |

| DRAWN DATE | DRAWN TIME | RECEIVED DATE | RECEIVED TIME | PHYSICIAN | |
|---|---|---|---|---|---|
| 6/22/07 | 6:50 | 6/22/07 | 23:00 | RUNYAN, PA(CCI) | |

| REPORT DATE | REPORT TIME | | | STATUS | PAGE |
|---|---|---|---|---|---|
| 6/23/07 | 9:38 | RESULT | | FINAL | 1 |

| TEST | OUT OF RANGE | IN RANGE | UNITS | REFERENCE RANGE |
|---|---|---|---|---|
| 2 | | | | |
| 6-895 | | | | |
| NON FASTING | | | | |
| **HEMATOLOGY** | | | | |
| WBC | | 6.5 | $10^3$/uL | 4.2-10.5 |
| RBC | 4.15 L | | $10^6$/uL | 4.6-6.2 |
| HgB | 12.7 L | | g/dL | 14-18 |
| HCT | 38.2 L | | % | 42-52 |
| MCV | | 91.9 | $um^3$ | 80-94 |
| MCH | | 30.6 | pg | 27-34 |
| MCHC | | 33.3 | % | 31.5-36.0 |
| RDW | | 11.5 | % | 11-14.8 |
| PLATELETS | | 399 | $10^3$/uL | 150-400 |
| MPV | | 8.7 | cu/mm | 6.8-10.6 |
| GRANULOCYTES % | 45.4 L | | % | 48.9-69.9 |
| GRANULOCYTES# | | 2.97 | $10^3$/uL | 1.5-6.7 |
| LYMPHOCYTES % | | 41.5 | % | 22.4-43.6 |
| LYMPHOCYTES# | | 2.71 | $10^3$/uL | 1.5-4.0 |
| MONOCYTES % | | 6.7 | % | 6.2-9.8 |
| MONOCYTES# | | 0.44 | $10^3$/uL | 0.2-0.8 |
| EOSINOPHIL % | 5.2 H | | % | 0-5.0 |
| EOSINOPHIL# | | 0.34 | $10^3$/uL | 0-0.40 |
| BASOPHIL % | | 1.2 | % | 0-2.0 |
| BASOPHIL# | | 0.08 | $10^3$/uL | 0-0.20 |
| RBC MORPHOLOGY | | Normal | | |

*Compare 2 past* (handwritten annotation next to HgB, HCT)

Signature: _____

1716 West Holt Ave.   •   Pomona, CA 91768   •   (909) 623-9301   •   FAX (909) 623-9306

# EXHIBIT 12

# MARSHALL S. LEWIS, M.D.

## TEHACHAPI CLINIC

February 8, 2008

RE:        HILL, RAYNARD
DOB:      3/10/60
CHART#:  IMC0667
CDC#:     H43428/California Correctional Institution

### ORTHOPEDIC TELEMED RE-EVALUATION

This patient returns today. He is having continuous problems and pain in the right shoulder. The patient can only abduct about 100 degrees and forward flex 100 degrees on the right side at this time.

Review of the MRI from September 12, 2007 read by Dr. Child, with the MRI at Kern Radiology, revealed under the conclusion "1) Severely degraded studies as a result of multiple paramagnetic signal artifacts from metal either post-surgical or post-traumatic with non-visualized distal acromion and acromioclavicular joint either due to distortion from post-traumatic or post-surgical abscess; 2) Probable complete tears of the supraspinatus and infraspinatus tendons with retraction and cephalic migration of the humeral head; 3) Non-visualized bicipital labral complex most probably due to paramagnetic signal artifact described above."

It has been discussed with the patient that there is severe tearing with retraction of the supraspinatus and infraspinatus. The cephalic migration of the humeral head is also a problem, which is felt to be fraught with inability to correct. I have explained to the patient that in the body of the report there is evidence of marked narrowing of the coracoacromial arch and this would go along with my diagnosis previously of impingement syndrome in the right shoulder. I have explained to the patient that no primary repair of the rotator cuff would be performed, as I feel the blood supply would probably be compromised with prior surgery and this probably would not heal. We will perform debridement of the subacromial bursa and rotator cuff with an anterolateral acromioplasty, resection of what remains of the coracoacromial ligament and possible resection at the distal end of the right clavicle. If he does not adequately heal from that, we could try a rotator cuff repair but, again, I told the patient that I think this is fraught

13061 Rosedale Highway, Ste. G, PMB-102-Bakersfield, CA 93312 (661) 871-6200 Fax (661) 871-6400

RE: HILL, RAYNARD
Page 2
February 8, 2008


with failure as the prior rotator cuff repair from 2000 performed by Dr. Harway has failed
completely. The patient accepts the risks and will undergo arthroscopy with arthroscopic
surgery of the right shoulder. Appropriate blood work will be ordered along with a chest
x-ray. The patient will be booked when approved by the carrier.


Marshall S. Lewis, M.D.
/sl
2/15/08

# EXHIBIT _3_

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

RAYNARD B. HILL, Plaintiff

V.

J. CHUDY, M.D., et al., Defendants.

**SUBPOENA IN A CIVIL CASE**

Case Number:[1] C07 3165 CRB (PR)

TO:  Custodian of Records, Calif. Subs. Abuse
     Treatment Fac. & State Prison
     P.O. Box 7100, Corcoran CA  93212

☐ **YOU ARE COMMANDED** to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☐ **YOU ARE COMMANDED** to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

☒ **YOU ARE COMMANDED** to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects): certified copies of medical and central file records pertaining to Raynard Byron Hill, H 43428, of his movement history, appeals pertaining to right shoulder pain, general and medical chronos, physician's orders, progress notes, consultant's reports, X-ray and MRI reports, medication administration records, requests for health services, and physical therapy notes, from July 1, 1992 to the present date regarding right shoulder pain complaints.

| PLACE | DATE AND TIME |
|---|---|
| 455 Golden Gate Ave., Ste. 11000, San Francisco, CA  94102-7004 | July 7, 2008 10:30 a.m. |

☐ **YOU ARE COMMANDED** to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *Jennifer C. Addams*  Deputy Attorney General, Attorney for Defendants | June 2, 2008 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Jennifer C. Addams, Dept. of Justice, 455 Golden Gate Ave., Ste. 11000, San Francisco, CA  94102-7004, 415-703-5500

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number

LexisNexis® Automated California Federal District Court Forms

subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend

trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| Vince Adams,<br>Litigation Coordinator | U.S. Mail |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| F. Yen | Sr. Legal Analyst |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on    June 2, 2008
                    DATE

_F. Yen_
SIGNATURE OF SERVER

455 Golden Gate Ave., Ste. 11000
ADDRESS OF SERVER

San Francisco, CA  94102-7004

---

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject

to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.

(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.

(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

LexisNexis® Automated California Federal District Court Forms

**DECLARATION OF SERVICE BY U.S. MAIL**

Case Name:   **HILL, Raynard B. v. Joseph Chudy, M.D. et al.**

No.:   **C 07-3165-CRB (PR)**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter; my business address is 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102-7004.

On <u>June 2, 2008</u>, I served the attached **Subpoena in a Civil Case** by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the United States Mail at San Francisco, California, addressed as follows:

Raynard B. Hill, Jr.   H43428
SATF/SP
c/o Litigation Coordinator
P.O. Box 7100
Corcoran, CA  93212

Litigation Coordinator
California Substance Abuse Treatment
Facility & State Prison
P.O. Box 7100
Corcoran, CA  93212

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on June 2, 2008, at San Francisco, California.

_____          _____
F. Yen                                                   F. Yen
Declarant                                               Signature

40760496.wpd

EXHIBIT _ 4

Attorney General of the State of California
2  PAUL T. HAMMERNESS
Supervising Deputy Attorney General
3  JENNIFER C. ADDAMS, State Bar No. 209355
Deputy Attorney General
4    455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
5    Telephone:    (415) 703-5382
Facsimile:     (415) 703-5480
6    Email: Jennifer.Addams@doj.ca.gov

7  Attorneys for Defendants J. Chudy, M.D.,
D. Pompan, M.D. and I. Grewal, M.D.

8

9                    IN THE UNITED STATES DISTRICT COURT

10                   FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12  **RAYNARD B. HILL, JR.,**                          Case No. C 07-3165-CRB (PR)

13                                        Plaintiff,   **DEFENDANT I. GREWAL,**
                                                       **M.D.'S RESPONSE TO**
14          v.                                         **PLAINTIFF'S REQUEST FOR**
                                                       **ADMISSION**
15  **JOSEPH CHUDY, et al.,**

16                                       Defendants.   The Honorable Charles R. Breyer

17

18  PROPOUNDING PARTY:     Plaintiff Raynard B. Hill

19  RESPONDING PARTY:      Defendant I. Grewal, M.D.

20  SET NO.                ONE

21                        **PRELIMINARY STATEMENT**

22          Defendants have not yet fully completed the investigation of the facts relating to this case

23  and have not yet fully completed discovery in this action. All of the responses contained herein

24  are based solely upon information and documents which are presently available to and

25  specifically known by Defendants, and disclose only those contentions which presently occur to

26  Defendants. It is anticipated that further discovery, independent investigation, legal research and

27  analysis will supply additional facts and lead to additions, changes, and variations from the

28  answers herein.

I. Grewal, M.D.'s Response to Plaintiff's Request for Admissions (Set One)    HILL, Raynard B. v. Joseph Chudy, et al.
                                                                              C 07-3165-CRB (PR)

1     The following responses are given without prejudice to the right to produce evidence or

2 witnesses which Defendants may later discover.   Defendants accordingly reserve the right to

3 change any and all responses herein as additional facts are ascertained, witnesses identified, and

4 legal research is completed.  The responses contained herein are made in good faith in an attempt

5 to supply as much factual information and as much specification of legal contention as is

6 presently known and should in no way prejudice Defendants in relation to further discovery and

7 proceedings.

8 REQUEST FOR ADMISSION NO. 1:

9     Is it true, CTF medical records show upon the plaintiff arrival in 2002, staff was aware of

10 plaintiff's re-injury and pain in Rt. shoulder?

11 RESPONSE TO REQUEST FOR ADMISSION NO. 1:

12     Deny.

13 REQUEST FOR ADMISSION NO. 2:

14     Is it true, that the basic x-ray does not show damage to tendons, ligiments [sic], or tissue

15 damage?

16 RESPONSE TO REQUEST FOR ADMISSION NO. 2:

17     Objection, this request is vague and ambiguous as to the terms "basic x-ray" and indefinite

18 as to time.  Subject to and without waiving this objection, deny.

19 REQUEST FOR ADMISSION NO. 3:

20     Is it true, the responsibility of any physician administering medication or treatment to a

21 patient should thoroughly review patients medical file?

22 RESPONSE TO REQUEST FOR ADMISSION NO. 3:

23     Deny.

24 REQUEST FOR ADMISSION NO. 4:

25     Is it true, that any patient who has been in pain from an injury continueously [sic] for many

26 years is to be considered a cronic [sic] care patient?

27 RESPONSE TO REQUEST FOR ADMISSION NO. 4:

28     Deny.

██████████████ Response to Request for Admissions (Set One)    *HILL, Raynard B. v. Joseph Chudy, et al.*
*C 07-3165-CRB (PR)*

2

1  REQUEST FOR ADMISSION NO. 5:

2      Is it true, that plaintiff's injury was mis-diagnosis [sic] causing delays in medical care and

3  treatment for numerous years?

4  RESPONSE TO REQUEST FOR ADMISSION NO. 5:

5      Objection, this request is vague and ambiguous as to the term "numerous years" and is

6  indefinite as to time.  Subject to and without waiving these objections, deny.

7  REQUEST FOR ADMISSION NO. 6:

8      Is it true, after x-ray and no findings, plaintiff was still in cronic [sic] pain, isn't standard

9  procedure is to order an M.R.I.?

10  RESPONSE TO REQUEST FOR ADMISSION NO. 6:

11      Objection, this request is indefinite as to time and is too vague and ambiguous as to prevent

12  an intelligent response.  Subject to and without waiving these objections, unable to admit or

13  deny.

14  REQUEST FOR ADMISSION NO. 7:

15      Is it true, from 3-14-03 - 9-8-06 plaintiff was given massive amounts of motrin/ibuprofen

16  tabs by CTF medical staff?

17  RESPONSE TO REQUEST FOR ADMISSION NO. 7:

18      Objection, this request is vague and ambiguous as to the term "massive amounts."  Subject

19  to and without waiving this objection, deny.

20  REQUEST FOR ADMISSION NO. 8:

21      Is it true, plaintiff sent numerous CDC 7362 medical request forms stating pain medication

22  given is not effective and in extreme pain?

23  RESPONSE TO REQUEST FOR ADMISSION NO. 8:

24      Objection, this request is indefinite as to time, and vague and ambiguous as to the term

25  "numerous."  Subject to and without waiving these objections, admit that plaintiff submitted

26  CDC 7362 forms.

27  ///

28  ///

1    REQUEST FOR ADMISSION NO. 9:

2        Is it true, that its common knowledge in the medical field, that excessive amounts of

3    ibuprofen/motrin given to a patient is potential to cause some to liver or organs of patient?

4    RESPONSE TO REQUEST FOR ADMISSION NO. 9:

5        Objection, this request is indefinite as to time and is unintelligible as to prevent an

6    intelligent response.  Subject to and without waiving this objection, unable to admit or deny.

7    REQUEST FOR ADMISSION NO. 10:

8        Is it true, that the delays, denials, picking and choosing which patient will see the doctor is

9    due to overcrowding the prison?

10    RESPONSE TO REQUEST FOR ADMISSION NO. 10:

11        Objection, this request is indefinite as to time, and vague and ambiguous as to the term

12    "picking and choosing."  Subject to and without waiving this objection, deny.

13    REQUEST FOR ADMISSION NO. 11:

14        Is it true, that those patients in cronic [sic] pain and need a stronger medication for injury

15    until procedure can be performed, are placed in a pain management program, where medication

16    is issued by the medical dept. daily?

17    RESPONSE TO REQUEST FOR ADMISSION NO. 11:

18        Objection, this request is indefinite as to time, and vague and ambiguous as to the term

19    "chronic."  Subject to and without waiving this objection, deny.

20    REQUEST FOR ADMISSION NO. 12:

21        Is it true, due to the inadequate equipment and unavailability of the M.R.I. trailer at the time,

22    was a contributing factor in plaintiff's being denied or delayed medical treatment to his rt.

23    shoulder, after doctor's order on 4/17/05?

24    RESPONSE TO REQUEST FOR ADMISSION NO. 12:

25        Deny.

26    REQUEST FOR ADMISSION NO. 13:

27        Is it true, that upon a doctor placing an order of treatment for a patient, that it's his/her duty

28    and responsibility to assure that the patient receives that ordered treatment?

1  RESPONSE TO REQUEST FOR ADMISSION NO. 13:

2      Objection, this request is indefinite as to time, and is vague and ambiguous as to the term

3  "duty and responsibility."  Subject to and without waiving this objection, deny.

4  REQUEST FOR ADMISSION NO. 14:

5      Is it true, that the Chief Medical Officer oversees, supervise, approve, and denys [sic] all

6  request of treatment of patients placed by doctor's that are under his/her control?

7  RESPONSE TO REQUEST FOR ADMISSION NO. 14:

8      Objection, this request is compound and is indefinite as to time.  Subject to and without

9  waiving this objection, answering defendant unable to admit or deny.

10  REQUEST FOR ADMISSION NO. 15:

11     Is it true, on 7-13-06 orthopedic Dr. Pompan was approved by U.R.C. to perform rotator

12  cuff repair on plaintiff's rt shoulder?

13  RESPONSE TO REQUEST FOR ADMISSION NO. 15:

14     Deny.

15  REQUEST FOR ADMISSION NO. 16:

16     Is it true that on 9-8-06 Plaintiff was transfered [sic] out of CTF in Soledad, CA., to CCI in

17  Tehachapi, CA.?

18  RESPONSE TO REQUEST FOR ADMISSION NO. 16:

19     Admit that plaintiff was transferred on September 8, 2006.  As to the remainder of the

20  request, unable to admit or deny.

21  REQUEST FOR ADMISSION NO. 17:

22     Is it true, that after 2 yrs of complaining that medication was ineffective, on 4-4-05 meds

23  dosage was increased to 800 mg, and then on 8-25-05 was reduced without any type of

24  treatment?

25  RESPONSE TO REQUEST FOR ADMISSION NO. 17:

26     Deny.

27  REQUEST FOR ADMISSION NO. 18:

28     Exhibit #1, CDC 602 Appeal 66# CTF-C-05-01422, filed 5-2-05.

1  RESPONSE TO REQUEST FOR ADMISSION NO. 18:

2      Objection, this request is unintelligible as to prevent an intelligent response. Subject to and

3  without waiving this objection, because it is unintelligible, unable to admit or deny.

4  REQUEST FOR ADMISSION NO. 19:

5      Exhibit #2, CDC602 Appeal C06# CTF-N-06-02486, filed 6-26-6.

6  RESPONSE TO REQUEST FOR ADMISSION NO. 19:

7      Objection, this request is unintelligible as to prevent an intelligent response. Subject to and

8  without waiving this objection, because it is unintelligible, unable to admit or deny.

9  REQUEST FOR ADMISSION NO. 20:

10      CDC 7221, Physician Orders, Medication Log & Mar sheet for self administered

11  medications Ex #3.

12  RESPONSE TO REQUEST FOR ADMISSION NO. 20:

13      Objection, this request is unintelligible as to prevent an intelligent response. Subject to and

14  without waiving this objection, because it is unintelligible, unable to admit or deny.

15  REQUEST FOR ADMISSION NO. 21:

16      CDC 7362 Health Care Services Request dated 2/05, 3/05, 8/05, 11/05 Ex #4.

17  RESPONSE TO REQUEST FOR ADMISSION NO. 21:

18      Objection, this request is unintelligible as to prevent an intelligent response. Subject to and

19  without waiving this objection, because it is unintelligible, unable to admit or deny.

20  REQUEST FOR ADMISSION NO. 22:

21      Exhibit #5, CDC 7243 Heathcare Services Physician Request for Service dated 4/05, 6/05,

22  1/06, 7/06.

23  RESPONSE TO REQUEST FOR ADMISSION NO. 22:

24      Objection, this request is unintelligible as to prevent an intelligent response. Subject to and

25  without waiving this objection, because it is unintelligible, unable to admit or deny.

26  REQUEST FOR ADMISSION NO. 23:

27      Exhibit #6, x-rays performed on 6-17-02 & 3-10-05.

28  ///

▬▬▬▬▬▬▬▬Response to Request for Admissions (Set One)       *HILL, Raynard B. v. Joseph Chudy, et al.*
                                                              C 07-3165-CRB (PR)

6

1  RESPONSE TO REQUEST FOR ADMISSION NO. 23:

2      Objection, this request is unintelligible as to prevent an intelligent response. Subject to and

3  without waiving this objection, because it is unintelligible, unable to admit or deny.

4  REQUEST FOR ADMISSION NO. 24:

5      Exhibit #&, Salinas Valley Radiologist M.R.I. on 11-21-05, Kern Radiology Medical Group

6  MRI on 9-12-07.

7  RESPONSE TO REQUEST FOR ADMISSION NO. 24:

8      Objection, this request is unintelligible as to prevent an intelligent response. Subject to and

9  without waiving this objection, because it is unintelligible, unable to admit or deny.

10  REQUEST FOR ADMISSION NO. 25:

11      Exhibit #8, U.C. Davis Health System Consultation by Dr. Jeffery L. Tanji:11-3-06.

12  RESPONSE TO REQUEST FOR ADMISSION NO. 25:

13      Objection, this request is unintelligible as to prevent an intelligent response. Subject to and

14  without waiving this objection, because it is unintelligible, unable to admit or deny.

15  REQUEST FOR ADMISSION NO. 26:

16      Exhibit #9, Dr. Marshall S. Lewis orthopedic surgeon consultation report 10-29-07.

17  RESPONSE TO REQUEST FOR ADMISSION NO. 26:

18      Objection, this request is unintelligible as to prevent an intelligent response. Subject to and

19  without waiving this objection, because it is unintelligible, unable to admit or deny.

20  REQUEST FOR ADMISSION NO. 27:

21      Exhibit #10, Watson Laboratories Inc., Manufacture of ibuprofen 3-6-07.

22  RESPONSE TO REQUEST FOR ADMISSION NO. 27:

23      Objection, this request is unintelligible as to prevent an intelligent response. Subject to and

24  without waiving this objection, because it is unintelligible, unable to admit or deny.

25  REQUEST FOR ADMISSION NO. 28:

26      Exhibit #11, Foundation Laboratory, Blood Test 6-27-07.

27  ///

28  ///

# EXHIBIT 5

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  PAUL T. HAMMERNESS
   Supervising Deputy Attorney General
3  JENNIFER C. ADDAMS, State Bar No. 209355
   Deputy Attorney General
4    455 Golden Gate Avenue, Suite 11000
   San Francisco, CA  94102-7004
5    Telephone:    (415) 703-5382
   Facsimile:    (415) 703-5480
6    Email: Jennifer.Addams@doj.ca.gov

7  Attorneys for Defendants J. Chudy, M.D.;
   D. Pompan, M.D., and I. Grewal, M.D.

8

9              IN THE UNITED STATES DISTRICT COURT

10          FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

| | |
|---|---|
| 12  **RAYNARD B. HILL, JR.,** | Case No. C 07-3165-CRB (PR) |
| 13                                     Plaintiff, | **DEFENDANT D. POMPAN,** |
| 14          v. | **M.D.'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS** |
| 15  **JOSEPH CHUDY, et al.,** | |
| 16                                    Defendants. | The Honorable Charles R. Breyer |

17

18  PROPOUNDING PARTY:    Plaintiff Raynard B. Hill

19  RESPONDING PARTY:    Defendant D. Pompan, M.D.

20  SET NO.                ONE

21              **PRELIMINARY STATEMENT**

22      Defendants have not yet fully completed the investigation of the facts relating to this case

23  and have not yet fully completed discovery in this action.  All of the responses contained herein

24  are based solely upon information and documents which are presently available to and

25  specifically known by Defendants, and disclose only those contentions which presently occur to

26  Defendants.  It is anticipated that further discovery, independent investigation, legal research and

     ılysis will supply additional facts and lead to additions, changes, and variations from the
     ıswers herein.

)efendant D. Pompan's Response to Request for Admissions (Set One)      *HILL, Raynard B. v. Joseph Chudy, et al.*
                                                                                                      *C 07-3165-CRB (PR)*

                                                          1

1    The following responses are given without prejudice to the right to produce evidence or

2   witnesses which Defendants may later discover.   Defendants accordingly reserve the right to

3   change any and all responses herein as additional facts are ascertained, witnesses identified, and

4   legal research is completed.  The responses contained herein are made in good faith in an attempt

5   to supply as much factual information and as much specification of legal contention as is

6   presently known and should in no way prejudice Defendants in relation to further discovery and

7   proceedings.

8   REQUEST FOR ADMISSION NO. 1:

9    Is it true, CTF medical records show upon the plaintiff arrival in 2002, staff was aware of

10   plaintiff's re-injury and pain in Rt. shoulder?

11   RESPONSE TO REQUEST FOR ADMISSION NO. 1:

12    Deny.

13   REQUEST FOR ADMISSION NO. 2:

14    Is it true, that the basic x-ray does not show damage to tendons, ligiments [sic], or tissue

15   damage?

16   RESPONSE TO REQUEST FOR ADMISSION NO. 2:

17    Objection, this request is vague and ambiguous as to the terms "basic x-ray" and indefinite

18   as to time.  Subject to and without waiving this objection, deny.

19   REQUEST FOR ADMISSION NO. 3:

20    Is it true, the responsibility of any physician administering medication or treatment to a

21   patient should thoroughly review patients medical file?

22   RESPONSE TO REQUEST FOR ADMISSION NO. 3:

23    Deny.

24   REQUEST FOR ADMISSION NO. 4:

25    Is it true, that any patient who has been in pain from an injury continuously [sic] for many

26   years is to be considered a cronic [sic] care patient?

27   RESPONSE TO REQUEST FOR ADMISSION NO. 4:

28    Deny.

Defendant D. Pompan's Response to Request for Admissions (Set One)    *HILL, Raynard B. v. Joseph Chudy, et al.*
*C 07-3165-CRB (PR)*

2

1   REQUEST FOR ADMISSION NO. 5:

2       Is it true, that plaintiff's injury was mis-diagnosis [sic] causing delays in medical care and

3   treatment for numerous years?

4   RESPONSE TO REQUEST FOR ADMISSION NO. 5:

5       Objection, this request is vague and ambiguous as to the term "numerous years" and is

6   indefinite as to time.  Subject to and without waiving these objections, deny.

7   REQUEST FOR ADMISSION NO. 6:

8       Is it true, after x-ray and no findings, plaintiff was still in cronic [sic] pain, isn't standard

9   procedure is to order an M.R.I.?

10  RESPONSE TO REQUEST FOR ADMISSION NO. 6:

11      Objection, this request is indefinite as to time and is too vague and ambiguous as to prevent

12  an intelligent response.  Subject to and without waiving these objections, unable to admit or

13  deny.

14  REQUEST FOR ADMISSION NO. 7:

15      Is it true, from 3-14-03 - 9-8-06 plaintiff was given massive amounts of motrin/ibuprofen

16  tabs by CTF medical staff?

17  RESPONSE TO REQUEST FOR ADMISSION NO. 7:

18      Objection, this request is vague and ambiguous as to the term "massive amounts." Subject

19  to and without waiving this objection, deny.

20  REQUEST FOR ADMISSION NO. 8:

21      Is it true, plaintiff sent numerous CDC 7362 medical request forms stating pain medication

22  given is not effective and in extreme pain?

23  RESPONSE TO REQUEST FOR ADMISSION NO. 8:

24      Objection, this request is indefinite as to time, and vague and ambiguous as to the term

25  "numerous."  Subject to and without waiving these objections, admit that plaintiff submitted

26  CDC 7362 forms.

27  ///

28  ///

Defendant D. Pompan's Response to Request for Admissions (Set One)        *HILL, Raynard B. v. Joseph Chudy, et al.*
                                                                          C 07-3165-CRB (PR)

3

1 REQUEST FOR ADMISSION NO. 9:

2     Is it true, that its common knowledge in the medical field, that excessive amounts of

3 ibuprofen/motrin given to a patient is potential to cause some to liver or organs of patient?

4 RESPONSE TO REQUEST FOR ADMISSION NO. 9:

5     Objection, this request is indefinite as to time and is unintelligible as to prevent an

6 intelligent response. Subject to and without waiving this objection, unable to admit or deny.

7 REQUEST FOR ADMISSION NO. 10:

8     Is it true, that the delays, denials, picking and choosing which patient will see the doctor is

9 due to overcrowding the prison?

10 RESPONSE TO REQUEST FOR ADMISSION NO. 10:

11     Objection, this request is indefinite as to time, and vague and ambiguous as to the term

12 "picking and choosing." Subject to and without waiving this objection, deny.

13 REQUEST FOR ADMISSION NO. 11:

14     Is it true, that those patients in cronic [sic] pain and need a stronger medication for injury

15 until procedure can be performed, are placed in a pain management program, where medication

16 is issued by the medical dept. daily?

17 RESPONSE TO REQUEST FOR ADMISSION NO. 11:

18     Objection, this request is indefinite as to time, and vague and ambiguous as to the term

19 "chronic." Subject to and without waiving this objection, deny.

20 REQUEST FOR ADMISSION NO. 12:

21     Is it true, due to the inadequate equipment and unavailability of the M.R.I. trailer at the time,

22 was a contributing factor in plaintiff's being denied or delayed medical treatment to his rt.

23 shoulder, after doctor's order on 4/17/05?

24 RESPONSE TO REQUEST FOR ADMISSION NO. 12:

25     Deny.

26 REQUEST FOR ADMISSION NO. 13:

27     Is it true, that upon a doctor placing an order of treatment for a patient, that it's his/her duty

28 and responsibility to assure that the patient receives that ordered treatment?

Defendant D. Pompan's Response to Request for Admissions (Set One)     *HILL, Raynard B. v. Joseph Chudy, et al.*
C 07-3165-CRB (PR)

4

1 RESPONSE TO REQUEST FOR ADMISSION NO. 13:

2    Objection, this request is indefinite as to time, and is vague and ambiguous as to the term

3 "duty and responsibility." Subject to and without waiving this objection, deny.

4 REQUEST FOR ADMISSION NO. 14:

5    Is it true, that the Chief Medical Officer oversees, supervise, approve, and denys [sic] all

6 request of treatment of patients placed by doctor's that are under his/her control?

7 RESPONSE TO REQUEST FOR ADMISSION NO. 14:

8    Objection, this request is compound and is indefinite as to time. Subject to and without

9 waiving this objection, answering defendant unable to admit or deny.

10 REQUEST FOR ADMISSION NO. 15:

11    Is it true, on 7-13-06 orthopedic Dr. Pompan was approved by U.R.C. to perform rotator

12 cuff repair on plaintiff's rt shoulder?

13 RESPONSE TO REQUEST FOR ADMISSION NO. 15:

14    Deny.

15 REQUEST FOR ADMISSION NO. 16:

16    Is it true that on 9-8-06 Plaintiff was transfered [sic] out of CTF in Soledad, CA., to CCI in

17 Tehachapi, CA.?

18 RESPONSE TO REQUEST FOR ADMISSION NO. 16:

19    Admit that plaintiff was transferred on September 8, 2006. As to the remainder of the

20 request, unable to admit or deny.

21 REQUEST FOR ADMISSION NO. 17:

22    Is it true, that after 2 yrs of complaining that medication was ineffective, on 4-4-05 meds

23 dosage was increased to 800 mg, and then on 8-25-05 was reduced without any type of

24 treatment?

25 RESPONSE TO REQUEST FOR ADMISSION NO. 17:

26    Deny.

27 REQUEST FOR ADMISSION NO. 18:

28    Exhibit #1, CDC 602 Appeal 66# CTF-C-05-01422, filed 5-2-05.

1   RESPONSE TO REQUEST FOR ADMISSION NO. 18:

2       Objection, this request is unintelligible as to prevent an intelligent response. Subject to and

3   without waiving this objection, because it is unintelligible, unable to admit or deny.

4   REQUEST FOR ADMISSION NO. 19:

5       Exhibit #2, CDC602 Appeal C06# CTF-N-06-02486, filed 6-26-6.

6   RESPONSE TO REQUEST FOR ADMISSION NO. 19:

7       Objection, this request is unintelligible as to prevent an intelligent response. Subject to and

8   without waiving this objection, because it is unintelligible, unable to admit or deny.

9   REQUEST FOR ADMISSION NO. 20:

10      CDC 7221, Physician Orders, Medication Log & Mar sheet for self administered

11  medications Ex #3.

12  RESPONSE TO REQUEST FOR ADMISSION NO. 20:

13      Objection, this request is unintelligible as to prevent an intelligent response. Subject to and

14  without waiving this objection, because it is unintelligible, unable to admit or deny.

15  REQUEST FOR ADMISSION NO. 21:

16      CDC 7362 Health Care Services Request dated 2/05, 3/05, 8/05, 11/05 Ex #4.

17  RESPONSE TO REQUEST FOR ADMISSION NO. 21:

18      Objection, this request is unintelligible as to prevent an intelligent response. Subject to and

19  without waiving this objection, because it is unintelligible, unable to admit or deny.

20  REQUEST FOR ADMISSION NO. 22:

21      Exhibit #5, CDC 7243 Heathcare Services Physician Request for Service dated 4/05, 6/05,

22  1/06, 7/06.

23  RESPONSE TO REQUEST FOR ADMISSION NO. 22:

24      Objection, this request is unintelligible as to prevent an intelligent response. Subject to and

25  without waiving this objection, because it is unintelligible, unable to admit or deny.

26  REQUEST FOR ADMISSION NO. 23:

27      Exhibit #6, x-rays performed on 6-17-02 & 3-10-05.

28  ///

Defendant D. Pompan's Response to Request for Admissions (Set One)        *HILL, Raynard B. v. Joseph Chudy, et al.*
                                                                          C 07-3165-CRB (PR)

1  RESPONSE TO REQUEST FOR ADMISSION NO. 23:

2     Objection, this request is unintelligible as to prevent an intelligent response.  Subject to and

3  without waiving this objection, because it is unintelligible, unable to admit or deny.

4  REQUEST FOR ADMISSION NO. 24:

5     Exhibit #&, Salinas Valley Radiologist M.R.I. on 11-21-05, Kern Radiology Medical Group

6  MRI on 9-12-07.

7  RESPONSE TO REQUEST FOR ADMISSION NO. 24:

8     Objection, this request is unintelligible as to prevent an intelligent response.  Subject to and

9  without waiving this objection, because it is unintelligible, unable to admit or deny.

10 REQUEST FOR ADMISSION NO. 25:

11    Exhibit #8, U.C. Davis Health System Consultation by Dr. Jeffery L. Tanji:11-3-06.

12 RESPONSE TO REQUEST FOR ADMISSION NO. 25:

13    Objection, this request is unintelligible as to prevent an intelligent response.  Subject to and

14 without waiving this objection, because it is unintelligible, unable to admit or deny.

15 REQUEST FOR ADMISSION NO. 26:

16    Exhibit #9, Dr. Marshall S. Lewis orthopedic surgeon consultation report 10-29-07.

17 RESPONSE TO REQUEST FOR ADMISSION NO. 26:

18    Objection, this request is unintelligible as to prevent an intelligent response.  Subject to and

19 without waiving this objection, because it is unintelligible, unable to admit or deny.

20 REQUEST FOR ADMISSION NO. 27:

21    Exhibit #10, Watson Laboratories Inc., Manufacture of ibuprofen 3-6-07.

22 RESPONSE TO REQUEST FOR ADMISSION NO. 27:

23    Objection, this request is unintelligible as to prevent an intelligent response.  Subject to and

24 without waiving this objection, because it is unintelligible, unable to admit or deny.

25 REQUEST FOR ADMISSION NO. 28:

26    Exhibit #11, Foundation Laboratory, Blood Test 6-27-07.

27 ///

28 ///

Defendant D. Pompan's Response to Request for Admissions (Set One)        *HILL, Raynard B. v. Joseph Chudy, et al.*
                                                                          C 07-3165-CRB (PR)

7

1  RESPONSE TO REQUEST FOR ADMISSION NO. 28:

2      Objection, this request is unintelligible as to prevent an intelligent response.  Subject to and

3  without waiving this objection, because it is unintelligible, unable to admit or deny.

4  REQUEST FOR ADMISSION NO. 29:

5      Exhibit #12, Dr. Marshall S. Lewis. Ortho. Surgeon Re-evaluation & Recommendation 2-8-

6  08.

7  RESPONSE TO REQUEST FOR ADMISSION NO. 29:

8      Objection, this request is unintelligible as to prevent an intelligent response.  Subject to and

9  without waiving this objection, because it is unintelligible, unable to admit or deny.

10

11      Dated:  July 29, 2008.

12                          Respectfully submitted,

13                          EDMUND G. BROWN JR.
                            Attorney General of the State of California

14                          PAUL T. HAMMERNESS
                            Supervising Deputy Attorney General

15

16

17

18                          JENNIFER C. ADDAMS
                            Deputy Attorney General

19
                            Attorneys for Defendants
20

21

22

23

24

25  40268838.wpd
    SF2008401759
26

27

28

Defendant D. Pompan's Response to Request for Admissions (Set One)        *HILL, Raynard B. v. Joseph Chudy, et al.*
                                                                          C 07-3165-CRB (PR)

8

RAYMOND B. HALL H43428
CSATF
PO BOX 7100
CORCORAN, CA. 93212

United States District of Ca
Northern District of Ca
450 Golden Gate,
San Francisco, CA. 9

CONFIDENTIAL

Legal Mail

8-04-08

LEGAL MATERIALS

LEGAL MATERIALS